IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–02357–EWN–BNB


HEIDI RAE SHAFFER,

      Plaintiff,

v.

SPHERION CORPORATION,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is an employment discrimination case. Plaintiff Heidi Rae Shaffer alleges that

Defendant Spherion Corporation violated the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 *et seq.*, by altering the terms and conditions of her employment and terminating

her on the basis of her dyslexia, and by retaliating against her for filing an earlier Equal

Employment Opportunity Commission ("EEOC") charge of discrimination. This matter is before

the court on "Defendant's Brief in Support of Motion for Summary Judgment," filed July 23,

2007. Jurisdiction is premised upon the existence of a federal question under 28 U.S.C. § 1331.

# FACTS

## 1.    Factual Background

### a.    Plaintiff's Disability

Plaintiff's discriminatory discharge claim is premised upon her purported disability of dyslexia, which Plaintiff claims limits her ability to read and write.  (Def.'s Br. in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 1 [filed July 23, 2007]; *admitted in relevant part at* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s Resp.], Resp. to Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 1 [filed Aug. 18, 2007].)  Although the parties disagree about the severity of Plaintiff's purported dyslexia, Plaintiff claims that: (1) her dyslexia caused her to repeat the third grade; (2) she received learning disability services until her graduation from high school; (3) her teachers taught her differently than other students by providing her more time and tailoring classes to her special needs; and (4) she received special accommodation in her placement testing prior to college and had difficulty keeping up with her reading assignments in college.  (Pl.'s Resp., Statement of Additional Disputed Facts [hereinafter "SAF"] ¶¶ 6[a]–[d]; *denied at* Def.'s Reply Br. in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Reply], Resp. to Statement of Additional Disputed Fact [hereinafter "RSAF"] ¶¶ 6[a]–[d] [filed Sept. 10, 2007].)[1]  Plaintiff

---

[1]Defendant's "denial" is premised upon its arguments that these claims are *inadmissible*, and that other evidence shows they are *not credible*.  (Def.'s Reply, RSAF ¶¶ 6[a]–[d].)  I engage these arguments below, and admonish Defendant for ignoring this court's practice standards. (*See* Practice Standards — Civil: Special Instructions Concerning Motions for Summary Judgment ¶ 7 ["Legal argument is not permitted (in Defendant's Response to Statement of Additional Disputed Facts)."].)

additionally claims that, as a result of her dyslexia, she: (1) sees things very differently from other people on the written page; (2) sometimes cannot tell when words are misspelled or ungrammatically arranged; (3) reads slowly and often has to read things over to understand them; and (4) sometimes has to sound out words, particularly unfamiliar ones, and ask her husband to identify certain words. (*Id.*, SAF ¶¶ 6[e]–[h]; *denied at* Def.'s Reply, RSAF ¶¶ 6[e]–[h].)[2] Plaintiff admits that she can read books, magazines, newspapers, road signs, and product labels (Def.'s Br., SOF ¶ 93; *admitted at* Pl.'s Resp., RSOF ¶ 93), but avers that — except for road signs which have specific shapes and colors — doing so requires long, painstaking efforts (Pl.'s Resp., RSOF ¶ 93; *admitted at* Def.'s Reply, Reply Concerning Undisputed Material Facts [hereinafter "RYSOF"] ¶ 93). Plaintiff now takes a medication for attention-deficit/hyperactivity disorder ("AD/HD"), which helps her focus and be more attentive to detail. (Def.'s Br., SOF ¶ 95; *admitted at* Pl.'s Resp., RSOF ¶ 95.)

### b.    *Hiring, Accommodation, and Promotion*

Plaintiff was hired by Defendant's predecessor in 1998 as a "Helpline Specialist." (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Resp., RSOF ¶ 3.) Plaintiff claims she told Defendant she was dyslexic and needed accommodations several weeks before she was hired. (Pl.'s Resp., Ex. I at 2 [Pl.'s Interrogs. Resp.]; Def.'s Br., Ex 1-2 at 9 [Pl. Dep.].) Plaintiff also claims that, throughout the course of her employment, she told each subsequent supervisor that she was dyslexic and needed accommodation and/or that each subsequent supervisor was apprised of the fact from his or her

---

[2]Defendant's "denial" of these facts is identical to its preceding denial, and is addressed accordingly below. (Def.'s Reply, RSAF ¶¶ 6[e]–[h].)

own interactions with Plaintiff, or from his or her conversations with previous supervisors. (Pl.'s Resp., Ex. I at 2–3 [Pl. Interrogs. Resp.]; Def.'s Br., Ex 1-2 at 9–10 [Pl. Dep.].) Defendant admits that, prior to February 2005, it provided Plaintiff with the accommodations of extra time to read and review documents and third-party proofreading of important documents. (Pl.'s Resp., SAF ¶ 8; *admitted at* Def.'s Reply, RSAF ¶ 8.)

In October or November of 2003, Plaintiff was promoted to the position of "Client Consultant" and assigned to work in Defendant's Aurora, Colorado, office. (Def.'s Br., SOF ¶ 5; *admitted at* Pl.'s Resp., RSOF ¶ 5.) The written job description for this position lists "[s]trong [c]ommunication skills," "[e]xcellent written and verbal communication," and "attention to detail" as "required skills." (*Id.*, Ex. 8 at 2 [Job Description].)

### c. First EEOC Charge

In May 2004, Plaintiff filed an EEOC charge of discrimination (the "first EEOC charge") against Defendant alleging discrimination on the part of her supervisor at the time, Kay Lauree Siegel. (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 6.) Plaintiff charged that, "[s]ince August 2003, I have been harassed and subjected to a hostile work environment." (*Id.*, Ex. 4 at 1 [First EEOC Charge].) Ms. Siegal's supervisor was Susan Harding. (Pl.'s Resp., SAF ¶ 24[j]; *admitted at* Def.'s Reply, RSAF ¶ 24[j].) Defendant terminated Ms. Siegal in October 2004 "in the wake of [P]laintiff's first charge, and based on complaints from Plaintiff and other employees." (Pl.'s Resp., SAF ¶ 9; *admitted at* Def.'s Reply, RSAF ¶ 9; *id.*, Ex. J at 11 [Def. Interrogs. Resp.].) Plaintiff never filed a lawsuit in connection with her first EEOC charge. (Def.'s Br., SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.)

### d.    Ms. Henson as Supervisor and Plaintiff's Self-Evaluation

In November 2004, Barbara Henson became Plaintiff's new supervisor. (*Id.*, SOF ¶ 11; *admitted at* Pl.'s Resp., RSOF ¶ 11.) Ms. Harding was Ms. Henson's supervisor. (Pl.'s Resp., SAF ¶ 24[j]; *admitted at* Def.'s Reply, RSAF ¶ 24[j].) When Ms. Henson took over, Plaintiff's job description remained unchanged, and no new written communication standards had been adopted. (*Id.*, SAF ¶ 20; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 20.)

In early February 2005, Plaintiff sent Ms. Henson a completed self-evaluation form in anticipation of Plaintiff's 2004 performance review. (Def.'s Br., SOF ¶ 19; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 19.) Ms. Henson made handwritten marks on a copy of the form to indicate spelling errors. (*Id.*, Ex. 7-1 at 13 [Henson Dep.], Ex. 11 [First Revised Self-Evaluation].) On February 10, 2005, Ms. Henson sent Plaintiff an email with a different copy of Plaintiff's self-evaluation form attached that included the line: "I included my comments regarding our discussion on your written communication skills." (*Id.*, Ex. 12 at 1 [2/10/05 Email].) This copy of Plaintiff's self-evaluation form did not contain Ms. Henson's handwritten marks. (*Id.*, Ex. 13 [Second Revised Self-Evaluation].) Plaintiff responded the same day, acknowledging that her self-evaluation form had contained "a lot of spelling errors" and apologizing that she "should of [sic] read it a few times before sending it to you." (*Id.*, SOF ¶ 23; *admitted at* Pl.'s Resp., RSOF ¶ 23.)

### e. Ms. Henson's Knowledge of Plaintiff's Dsylexia and Request for Accommodations

Ms. Henson testified that, sometime prior to meeting with Plaintiff to discuss her performance review, she had a meeting with someone whom she could not remember "regarding [Plaintiff's] poor communication skills and if there was an issue." (*Id.*, Ex. 7-1 at 14 [Henson Dep.].) On February 8, 2005, Ms. Henson received an email from Kerry Lennon, Defendant's human resources director, in which Ms. Lennon urged her to "closely manage" Plaintiff regarding the "areas of concern with [her] communication," because, as Ms. Lennon wrote: "I would be concerned with taking any other approach based on her history." (*Id.*, Ex. 14 at 1 [2/8/2005 Email].)

Ms. Henson also testified that she learned of Plaintiff's dyslexia through a conversation with Ms. Harding about Plaintiff's communication skills, and admits she knew about Plaintiff's claim to have dyslexia in February 2005, prior to her first face-to-face meeting with Plaintiff. (*Id.*, Ex.7-1 at 7 [Henson Dep.]; Pl.'s Resp., SAF ¶ 25[e]; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 25[e].)

Finally, Ms. Henson testified that, prior to February 23, 2005, Plaintiff had only discussed her request for reasonable accommodations with her "in [their] performance review and the subsequent conversations with that." (Def.'s Br., Ex. 7-1 at 18 [Henson Dep.].) Plaintiff avers that, in her first meeting with Ms. Henson in February 2005, Ms. Henson asked her what reasonable accommodations she needed, and she told Ms. Henson she needed "extra time" and to have "important documents proofread." (Pl.'s Resp., Ex. I at 3 [Pl. Interrogs. Resp.].) Plaintiff

further avers that Ms. Henson told her she would think about the requested accommodations, talk to human resources, and have a subsequent meeting with Plaintiff in two weeks to discuss the issue. (*Id*.) On February 17, 2005, Ms. Henson sent Plaintiff an email which stated: "After we talk . . . tomorrow, let's regroup on our discussion last week regarding improvement of your written communication skills." (Def.'s Br., Ex. 12 at 2 [2/17/05 Email].)

### f. *"Final Warning Notification," Thirty-Day Improvement Plan, and Termination*

On February 23, 2005, Ms. Henson met with Plaintiff and gave her a document placing her on a thirty-day improvement plan. (*Id*., SOF ¶ 29; *admitted at* Pl.'s Resp., RSOF ¶ 29.) The document, entitled "Final Warning Notification," outlined purported insufficiencies in Plaintiff's present and past "written communication skills," and counseled Plaintiff to, *inter alia*, "take additional time to review [her] communications . . . before sending." (*Id*., Ex 15 at 1 [Final Warning].) The notification further advised: "If . . . you would like someone to proofread your communication [sic] prior to finalizing, send them to me for review." (*Id*.) The notification stated: "Failure to make immediate and sustained improvement in these areas will lead to immediate termination." (*Id*.) On February 25, 2005, Plaintiff sent Ms. Henson an email stating: "[o]ne of my concerns is that I have been issued a Final Warning, however, I never been issue [sic] any type [sic] warning before the Final Warning." (*Id.*, SOF ¶ 38; *admitted at* Pl.'s Resp., RSOF ¶ 38.)

Over the course of the next month, Plaintiff and Ms. Henson had at least three meetings regarding Plaintiff's communications. (*Id.*, SOF ¶ 40, *deemed admitted in relevant part at* Pl.'s

Br., RSOF ¶ 40.)[3]  Plaintiff testifies that Ms. Henson "would explain, like, go through each of the e-mails that I sent her . . . [and] [say] how many mistakes I had and if there was an improvement." (*Id.*, Ex. 1-2 at 16 [Pl. Dep.].)  Plaintiff also testified that Ms. Henson reviewed a fairly large number of her emails and sent back revisions.  (*Id.*)

On March 2, 2005, Plaintiff sent Ms. Henson an email describing the accommodations of extra time and third-party proofreading which she asserted Defendant had always provided her and stated: "I am here by [sic] requesting these reasonable accommodations continue."  (*Id.*, Ex. 28 at 1 [3/2/05 Email Exchange].)  Ms. Henson responded that Plaintiff's requested accommodations were already integrated into her thirty-day improvement plan, and asserted: "I stand ready to proofread any documents that you would like reviewed, although to date you have not sent any to me."  (*Id.*)  Ms. Henson acknowledged that Defendant had provided Plaintiff's requested accommodations in the past, but wrote: "[Y]our written communication skills continued to be an area where improvement was needed.  That is why it was raised in your annual review and why we met on February 23, 2005 [sic] to discuss it later."  (*Id.*)

On March 18, 2005, Ms. Henson sent an email to Ms. Lennon and another redacted recipient recounting her "last counseling meeting with [Plaintiff]," during which she claimed she had told Plaintiff that she "really had not seen an improvement in her communications, and that there were still errors in spelling and grammar."  (*Id.*, Ex. 27 at 1 [2/18/05 Email].)  Ms. Henson

_____

[3]Plaintiff's "denial" is predicated upon a factual dispute regarding the precise number of meetings, and whether these meetings constituted "feedback and counseling."  (Pl.'s Resp., RSOF ¶ 40.)  Plaintiff admits that there were at least three meetings in which Plaintiff and Ms. Henson discussed — in whatever capacity — her communications.  (*Id.*)

concluded: "Unless either of you have any objections, I am moving forward with [Plaintiff's] termination on Tuesday, as planned." (*Id.*) On March 22, 2005, Ms. Henson terminated Plaintiff. (*Id.*, SOF ¶ 70; *admitted in relevant part at* Pl.'s Br., RSOF ¶ 70.) A "Termination Form" with a "[d]ate [c]reated" entry of "3/24/2005," lists the reason for Plaintiff's termination as "[u]nsatisfactory [p]erformance." (*Id.*, Ex. 28 at 1 [Termination Form].)

### g.     *Unemployment Benefits, Second EEOC Charge, and New Position*

Following her termination, Plaintiff applied for unemployment benefits from the Colorado Department of Labor and Employment ("CLDE"). (*Id.*, SOF ¶ 88; *admitted at* Pl.'s Resp., RSOF ¶ 88.) On April 15, 2005, the CDLE informed Plaintiff that it was conferring benefits upon her because: "You were separated from this employment because you were mentally unable to perform the work." (Def.'s Reply, Ex. 35 at 19 [CDLE Notification].)

On April 26, 2005, Plaintiff filed an EEOC charge of discrimination against Defendant alleging she had been denied reasonable accommodation. (Def.'s Br., Ex. 29 at 1 [Second EEOC Charge].) Plaintiff wrote: "I believe I have been discriminated against because of my disability . . . and in retaliation for filing [the first EEOC charge]." (*Id.*)

Since May of 2005, Plaintiff has held a position with a construction company that she states is "kind of [sic] the same realm of what [she] was doing before." (*Id.*, Ex. 1-1 at 8 [Pl.'s Dep.].)

## 2.     *Procedural History*

On November 11, 2006, Plaintiff filed a complaint in this court. (Compl. [filed Nov. 22, 2006].) On November 28, 2006, Plaintiff filed an amended complaint in which she alleges

Defendant violated the ADA by: (1) discriminatorily altering the terms and conditions of her employment and terminating her on the basis of her disability; and (2) retaliating against her for opposing disability discrimination. (Am. Compl. ¶¶ 25–26 [filed Nov. 28, 2006].)

On July 23, 2007, Defendant filed a motion for summary judgement. (Def.'s Br.) Defendant argues Plaintiff cannot maintain her disability discrimination claim because she cannot establish a *prima facie* case of discrimination, or, even if she can, cannot show Defendant's stated reasons for terminating her were pretextual. (*Id.* at 17–32.) Defendant also argues Plaintiff cannot establish a *prima facie* case of retaliation. (*Id.* at 32–35.) On August 18, 2007, Plaintiff filed a response to Defendant's motion. (Pl.'s Resp.) On September 10, 2007, Defendant filed a reply in support of its motion for summary judgment. (Def.'s Reply.) On September 24, 2007, Defendant filed an unopposed motion for leave to file supplemental authority. (Unopposed Mot. for Leave to File Supplemental Authority in Supp. of Def.'s Mot. for Summ. J. [filed Sept. 9, 2007] [hereinafter "Unopposed Mot."].) On September 28, 2007, I granted this motion. (Order [filed Sept. 28, 2007].) This matter is fully briefed.

## ANALYSIS

### 1. *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2007).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      *Evaluation of Claims***

      ***a.       Disability Discrimination***

        Title I of the ADA provides that no covered employer shall "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42

U.S.C.A. § 12112(a) (West 2007); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 476 (1999).

The familiar burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973) applies to ADA claims. *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1109 (10th Cir.

1999). To state a *prima facie* case under the ADA, Plaintiff must establish that: (1) she is

"disabled" within the meaning of the ADA; (2) she is "qualified;" and (3) she suffered an adverse

employment action because of her disability. *See Poindexter v. Atchison, Topeka & Santa Fe Ry.*,

168 F.3d 1228, 1230 (10th Cir. 1999). Once Plaintiff has established a *prima facie* case,

Defendant bears the burden of producing a legitimate, nondiscriminatory reason for its adverse

employment action. *Butler v. City of Prairie Vill.*, 172 F.3d at 747 (10th Cir. 1999) (citation

omitted). If Defendant produces such a reason, Plaintiff has the opportunity to prove this reason

"was in fact pretext." *Id.* at 747–48 (citation and quotation marks omitted).

Defendant argues Plaintiff cannot establish a *prima facie* case of disability discrimination

because she: (1) is not "disabled" under ADA; (2) is not "qualified;" and (3) cannot prove she was

terminated "because of" her disability. (Def.'s Br. at 19–27.) Defendant additionally argues its

reason for terminating Plaintiff was legitimate and nondiscriminatory, and Plaintiff cannot

demonstrate pretext. (*Id.* at 27–32.) I assess each of these arguments in turn.

### i.    *Plaintiff's Disability*

The ADA's defines "disability" to include: "a physical or mental impairment that

substantially limits one or more of the major life activities of [an] individual." 42 U.S.C.A. §

12102(2)(A) (West 2007).  Defendant contends Plaintiff is not "disabled" under this definition because: (1) reading is not a major life activity; and (2) Plaintiff is not substantially limited in this activity.[4]  (Def.'s Br. at 19–22.)  I address each of these arguments in turn.

A. READING AS A MAJOR LIFE ACTIVITY — "Major life activities" are defined under the regulations implementing the ADA as: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i) (2007).  The Tenth Circuit has specified that this list is not exclusive, and that a "major life activity," is "a basic activity that the average person in the general population can perform with little or no difficulty."  *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999.)

Although this court is unaware of any Tenth Circuit case on point, at least two other circuit courts have held that "reading" constitutes "a major life activity."  *See Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 2000); *Head v. Glacier N.W. Inc.*, 413 F.3d 1053, 1062 (9th Cir. 2005).  As the Ninth Circuit reasoned:

---

[4]Defendant additionally argues, for the first time in its reply, that Plaintiff fails to proffer sufficient admissible evidence to prove that she has a mental impairment.  (Def.'s Reply at 32.)  First, I note that consideration of this argument would be unfair to Plaintiff without first permitting a surreply.  *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (holding that district court may avoid error by choosing not to respond to new arguments raised in a reply, or by permitting non-moving party to file a surreply).  Second, I note that Plaintiff's submission of what purports to be a licensed psychologist's report diagnosing her with, *inter alia*, dyslexia, would likely be sufficient to demonstrate a genuine issue regarding whether Plaintiff has a mental impairment, notwithstanding purported foundational problems with this report that Plaintiff could likely cure in a surreply.  (*See* Pl.'s Resp., Ex. H at 5 [Disability Report].)  Accordingly, I assume for the purposes of this motion that Plaintiff has a mental impairment.

The ability to read is necessary in many instances to perform major life activities such as caring for oneself, learning, and working. As such, it is of central importance to most people's daily lives. To be sure, a person will not die merely because he or she cannot read, but that is not the standard. The fact that reading is of comparative importance, and that it is central to most people's daily lives, establishes that reading is a major life activity. Consequently, we hold that reading is a major life activity.

*Head*, 413 F.3d at 1062; *accord Rothberg v. Law Sch. Admission Council, Inc.*, 300 F. Supp. 2d 1093, 1104 (D. Colo. 2004), *rev'd on other grounds*, 102 F. App'x 122 (10th Cir. 2004).

The Ninth Circuit's reasoning is persuasive, and I find that reading is "a basic activity that the average person in the general population can perform with little or no difficulty." *Pack*, 166 F.3d at 1305 (10th Cir. 1999). Defendant points this court to no cases to the contrary, and its attempts to distinguish the Ninth Circuit's and Second Circuit's holdings are unavailing. For instance, Defendant tries to minimize *Head* by arguing that the Ninth Circuit "confused reading, an ability that 'is necessary in many instances to perform major life activities,' with an actual life activity." (Def.'s Reply at 34 [quoting *Head*, 413 F.3d at 1062.].) Nonetheless, I find no inherent contradiction in the idea that one major life activity may be necessary to another.

Defendant additionally tries to bolster its argument by citing *Pack* for the proposition that "activities that 'may be a significant and necessary component of a major life activity' should not be confused with major life activities." (Def.'s Reply at 34 [quoting *Pack*, 166 F.3d at 1305].) Defendant's citation to *Pack* is unavailing. In *Pack*, the Tenth Circuit held that concentration, although potentially "a significant and necessary component" of the major life activities of working, learning, or speaking, was "not itself a major life activity" because it was "not an

'activity' itself." *Pack*, 166 F.3d at 1305. By contrast, reading and writing clearly *are* "activities," so *Pack* is inapposite.

Finally, Defendant attempts to distinguish *Bartlett* by stating "the parties [in *Bartlett*] did not dispute that reading was a major life activity." (Def.'s Reply at 33–34.) While this is true, it is also *irrelevant* to the fact that the Second Circuit *explicitly held* that reading was a major life activity, even if it did not have to. *See Bartlett*, 226 F.3d 80 ("[W]e do not decide whether life activities such as studying and test-taking are 'major.' It is sufficient for us to hold that 'reading' and 'working' are major life activities."). Accordingly, I find that reading constitutes "a major life activity," and decline to decide whether writing similarly constitutes "a major life activity" as a *prima facie* case of disability under the ADA only requires "a physical or mental impairment that substantially limits *one or more* of the major life activities of such individual." 42 U.S.C.A. § 12102(2)(A) (West 2007) (emphasis added).

B. DYSLEXIA AS A "SUBSTANTIAL LIMITATION" ON PLAINTIFF'S ABILITY TO READ — To be "substantially limited" in a major life activity, a plaintiff must be "severely restrict[ed]" or restricted "to a large degree" in her ability to perform the major life activity. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 196–97, 198 (2002). A physical or mental impairment is "substantially limiting" if an individual is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1130 (10th Cir. 2003). In

addition, the court takes into consideration any corrective or mitigating measures which an individual utilizes, such as medication. *Id.*, 342 F.3d at 1130.

I find that Plaintiff has proffered sufficient evidence to demonstrate a genuine issue regarding whether she is "[s]ignificantly restricted" as to the condition, manner, or duration under which she can read as compared to the average person in the general population. *Id.* Specifically, Plaintiff has proffered deposition and affidavit testimony that: (1) her dyslexia caused her to repeat the third grade; (2) she received learning disability services until her graduation from high school; (3) her teachers taught her differently than other students by providing her more time and tailoring classes to her special needs; and (4) she received special accommodation in her placement testing prior to college and had difficulty keeping up with her reading assignments in college. (Def.'s Br., Ex 1-1 at 7, 9–10 [Pl. Dep.]; Pl.'s Resp. Ex. L at 1–2 [Pl. Aff.].) Plaintiff has further proffered her deposition and affidavit testimony that, as a result of her dyslexia, she: (1) sees things very differently on the written page from other people; (2) sometimes cannot tell when words are misspelled or ungrammatically arranged; (3) reads slowly and often has to read things over to understand them; and (4) sometimes has to sound out words, particularly unfamiliar ones, and ask her husband to identify certain words. (*Id.*, Ex 1-1 at 7, 12 [Pl. Dep.], Ex. 1-3 at 12–13 [Pl. Dep.]; Pl.'s Resp. Ex. L at 1–2 [Pl. Aff.].) Finally, Plaintiff has proffered her affidavit testimony that she can read books, magazines, newspapers, road signs, and product labels, but that — except for road signs which have specific shapes and colors — doing so requires long, painstaking efforts. (Pl.'s Resp., Ex. L at 2 [Pl. Aff.].) Based on this proffered evidence, I find

Plaintiff has demonstrated a genuine issue of material fact regarding whether she is "significantly restricted" as to the condition, manner, or duration under which can read as compared to the average person in the general population. *Doebele*, 342 F.3d at 1130.

Defendant argues that summary judgment is nonetheless appropriate because: (1) much of Plaintiff's proffered evidence is inadmissible; and (2) other substantial evidence suggests that Plaintiff was *not* substantially limited in her ability to read. (Def.'s Br. at 21–22; Def.'s Reply at 35–37, RSAF ¶¶ 6[a]–[h].) These arguments are unavailing.

Defendant's admissibility argument is unconvincing on its face. Defendant argues that Plaintiff's deposition and affidavit testimony relating to her dyslexia is inadmissable because: "[Plaintiff] is not competent to testify about medical or psychological diagnoses, treatment or causes and effects, whether dyslexia is a learning disability, or whether it substantially limits her in reading and writing." (Def.'s Reply, RSAF ¶¶ 6[e]–[h].) Whether or not Plaintiff is competent to testify to the actual effects of her dyslexia, she is clearly competent to testify to *her own perceptions* of the same, including how she *perceives* dyslexia to affect her ability to read, and her *memory* regarding how long she has experienced such perceived symptoms. *See* Fed. R. Evid. 602 (2007) (witness may testify to matters in her personal knowledge). Such evidence is germane to determining whether Plaintiff is "substantially limited" in her ability to read, regardless of whether it could additionally establish that Plaintiff actually *has* dyslexia, or that dyslexia actually

*causes* her perceived symptoms.[5]  *See, e.g.*, *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 497–99 (10th Cir. 2000) (considering, *inter alia*, a plaintiff's deposition and declaration in assessing whether she was substantially limited in the areas of learning, sleeping, and thinking).  Thus, I find that Plaintiff's proffered deposition and affidavit testimony is admissible to demonstrate a genuine issue regarding the condition, manner, or duration under which Plaintiff can read.

Second, Defendant's proffered evidence that Plaintiff: (1) received A's in college; (2) can read books, magazines, the newspaper, road signs, and product labels; (3) now takes medication for AD/HD; and (4) currently performs another job within the same general class as her old work does not affect my holding.  (*See* Def.'s Br. at 21–22; Def.'s Reply at 35–37.)  Although such evidence suggests that Plaintiff can read, it by no means undermines her assertion that she has great difficulty doing so.  At most, such evidence merely highlights the traditional rationale for leaving the of question of whether a plaintiff's impairment substantially limits her major life activities to the jury, and raises additional issues regarding Plaintiff's credibility that further preclude summary judgement.  *See, e.g., Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762, 765 n.1 (10th Cir. 2006) (noting that question of whether impairment substantially limits a plaintiff's major life activity is generally left to the jury).  Accordingly, I find Defendant's proffer of *additional* evidence suggesting that Plaintiff was *not* substantially limited in her ability to read is insufficient to undermine my holding.

_____

[5]To the extent that Defendant's objection is aimed at these latter questions, I note it is foreclosed by Defendant's failure to timely argue that Plaintiff does not have a mental impairment. (*See* footnote 4, *supra*.)

Finally, the only two cases Defendant *does* analyze in depth to suggest it is entitled to summary judgment *as a matter of law* are inapposite. (*See* Def.'s Reply at 35–37.) First, *Wong v. Regents of University of California*, 410 F.3d 1052, 1063 (9th Cir. 2005) is distinguishable from the case at bar because the Ninth Circuit was assessing whether a plaintiff's learning disability "limited his ability to learn as a whole, *for purposes of daily living*, as compared to most people." *Wong*, 410 F.3d at 1065 (emphasis added). The court found that it did not, in part because plaintiff had presented no evidence suggesting he was "limited in his ability to read for purposes of daily living" as opposed to just purposes of higher education. (*Id.*) Plaintiff here, by contrast, has demonstrated a genuine issue regarding whether she is limited in her ability to read *for the purposes of daily living* in both her deposition and affidavit, thus rendering *Wong* inapposite. (*See* Def.'s Br., Ex 1-1 at 7, 12 [Pl. Dep.], Ex. 1-3 at 12–13 [Pl. Dep.]; Pl.'s Resp. Ex. L at 1–2 [Pl. Aff.].) Second, *Gonzales v. National Board of Medical Examiners*, 225 F.3d 620 (6th Cir. 2006) is distinguishable because the Sixth Circuit was affirming a district court's crediting of a defendant's expert witnesses whose in-court testimony in a preliminary injunction hearing had undercut the plaintiff's own testimony regarding the severity of his learning disability. *Id.*, 225 F.3d at 628. The case at bar is distinguishable because Defendant has proffered no expert testimony to undercut Plaintiff's testimony, and credibility determinations are in any event improper in a summary judgement determination. Accordingly, I decline to hold that Plaintiff's dyslexia does not "substantially limit" her ability to read as a matter of law.

## ii.    Qualified Individual with a Disability

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires."  42 U.S.C.A. § 12111(8) (2007).  Defendant contends that Plaintiff is not "qualified" because: (1) Plaintiff cannot perform the essential functions of her job even *with* accommodation; and (2) the accommodation Plaintiff requests is unreasonable.  (Def.'s Br. at 19–27.)

To determine whether a Plaintiff is "qualified" under the ADA, the Tenth Circuit has promulgated a two-part test.  *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003).  First, the court must determine whether the individual can perform the essential functions of her job.  *Id*.  Second, "if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable [her] to perform those functions."  *Id*.  "Essential function[s]" are defined under the regulations implementing the ADA as "the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1) (2007).  Evidence considered in determining whether a particular function is essential includes, *inter alia*, the employer's judgement and written job descriptions.  *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004).

In the instant case, there is no meaningful dispute that the essential functions of Plaintiff's "Client Consultant" position included "strong communication skills," "excellent written and verbal

-20-

communication," and "attention to detail." (*See* Def.'s Br. at 25; Pl.'s Resp. at 40). These skills are explicitly listed in the "Client Consultant" job description, and Plaintiff points to no evidence suggesting these skills were *not* essential to her job. (Def.'s Br., Ex. 8 at 2 [Job Description].) There is likewise no meaningful dispute that Plaintiff was unable to perform the essential functions of her job *without* accommodation. (*See* Def.'s Br. at 24–27; Pl.'s Resp. at 39–40.) Plaintiff tacitly acknowledges as much by stating that her "success [in her job] *had always* been enhanced by . . . reasonable accommodations," and points to no evidence that she was able to perform her job without such accommodations. (Pl.'s Resp. at 40.)

  Accordingly, I must turn to the question of whether Plaintiff could perform the essential functions of her job *with* reasonable accommodation. "Reasonable accommodation" is defined under the ADA to include: "appropriate adjustment or modifications of . . . policies, the provision of qualified readers . . . and other similar accommodations for individuals with disabilities." 42 U.S.C.A. § 12111(9)(B) (West 2007). Whether a particular accommodation is reasonable depends upon the circumstances of the individual case. *Kuehl v. Wal-Mart Stores, Inc.*, 909 F. Supp. 794, 802 (D. Colo. 1995).

  I find that Plaintiff has demonstrated a genuine issue regarding whether she could perform her job with accommodation, and analyze below whether Plaintiff's requested accommodations were "reasonable." To demonstrate that she could perform her job with accommodation, Plaintiff has cites evidence that she was successful in her job at least between the date of her promotion to the "Client Consultant" position in October or November of 2003, and the date Ms. Henson

-21-

became her new supervisor in November 2004. (Pl.'s Resp., SAF ¶ 1; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 1.)[6] Plaintiff has additionally cited evidence that, during this period, she received the accommodations of: (1) extra time to read and review documents; and (2) third-party proofreading of important documents. (*Id.*, SAF ¶ 8; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 8.) Finally, Plaintiff has cited evidence that her "Client Consultant" job description remained unchanged after Ms. Henson became her new supervisor in November 2004, and that no new written communication standards were adopted. (*Id.*, SAF ¶ 20; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 20.) Viewing these facts in the light most favorable to Plaintiff, I find a reasonable jury could conclude Plaintiff was capable of performing the essential functions of her "Client Consultant" position with accommodation, as demonstrated by the fact that *she actually apparently did* for approximately one year prior to the date Ms. Henson became her new supervisor.

Defendant nonetheless urges against this conclusion on three main grounds. (*See* Def.'s Br. at 24–26; Def.'s Reply at 38–40.) First, Defendant argues that, because Plaintiff received her requested accommodations during the thirty-day improvement period and *still failed to*

---

[6]Defendant's only quibbling with this fact is that: "[Plaintiff's] job performance *in other positions* and in the years *prior to 2004 [and] 2005* has no bearing on her job performance in 2004 [and] 2005 as a Client Consultant." (Def.'s Reply, RSAF ¶ 1 [emphasis added].) Defendant additionally cross-references a 1999 "Interim Assessment," in which, despite rating Plaintiff "Excellent" in five out of six categories, her supervisor included the line: "I would like to see her improve her written communications by taking a seminar/class that would help her improve in this area." (Def.'s Br., Ex. 9 at 2 [1999 Interim Review].) Even assuming this review is negative, according to Defendant's own logic, it "has no bearing on [Plaintiff's] job performance . . . as a Client Consultant." (*See* Def.'s Reply, RSAF ¶ 1.)

adequately perform her job, such failure shows she was *incapable* of performing the essential functions of her job with accommodation *as a matter of law.* (*See* Def.'s Br. at 25–26.) I disagree. Defendant has cited no authority in support of this proposition, and I find that any evidence suggesting Plaintiff *failed* to perform the essential functions of her job during the thirty-day improvement period constitutes only weak negative evidence that she was *incapable* of so doing. Such evidence *might* support Defendant's claim that Plaintiff was fired for legitimate, non-discriminatory reasons, but it is largely inapposite here.

Second, Defendant argues that, because it is the "employer's . . . prerogative to set job requirements," Plaintiff's job performance prior to when Ms. Henson became her manager is "immaterial." (Def.'s Reply at 38.) Although imprecisely reasoned, Defendant appears to argue that, although the written job description for Plaintiff's position remained unchanged after Ms. Henson became Plaintiff's supervisor, the unwritten expectations had changed, and Plaintiff's previously successful employment is therefore inapposite in speaking to whether she was capable of performing the *new* essential functions of her job *at the time she was terminated.* Again, I disagree. Although Defendant is correct that "[t]he ADA does not limit an employer's ability to establish or change the content, nature, or functions of a job," *see Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995), it does not ineluctably follow that a plaintiff's performance of one job is somehow "immaterial" to the question of whether she was capable of performing another. On the contrary, such evidence might be *very* material, particularly if the only difference

between the two purportedly different jobs is the rigor with which their identically written job descriptions are enforced. Thus, I find Defendant's second argument unconvincing.

Finally, Defendant points this court to two statements Plaintiff made that it claims are inconsistent with her assertion that she can perform the essential functions of her job with accommodation. (*See* Def.'s Br. at 23–25.) Neither of these statements is more than highly equivocal on the question of whether Plaintiff believes she was capable of performing the essential functions of her job with accommodation. (*See id.*) First, Plaintiff stated in a deposition that: "I did tell [Ms. Henson] that it's something I cannot change, that I was never going to be able to fully recover from having dyslexia." (Def.'s Br., Ex.1-2 at 17 [Pl. Dep.].) Nonetheless, the parties predictably fight over whether the referent of Plaintiff's pronoun "it" is her dyslexia, or the communication problems flowing therefrom, and the deposition itself is unclear. (*See id*. at 26; Pl.'s Resp. at 41; *id.*, Ex.1-2 at 17 [Pl. Dep.]). Second, Plaintiff responded to a question on an EEOC intake questionnaire asking her why she believed her termination had been the result of discrimination as follows: "Because I was told my employment was terminated because I had not 'turned around' my written communications." (*Id.*, Ex. 33 at 4 [EEOC Intake Questionnaire].) This statement is highly ambiguous as to what Plaintiff believes her true capabilities are. Moreover, even if both these statements were completely unequivocal, neither of them, either

individually or in combination, would demonstrate that Defendant is entitled to judgment *as a matter of law*, as Defendant has pointed this court to no cases so holding.[7]  (*See id.*)

Additionally, I find that Plaintiff has demonstrated a genuine issue regarding whether the accommodations she requested were "reasonable."  Courts in the Tenth Circuit use a burden-shifting analysis to determine whether an accommodation is reasonable.  *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir.1995).  Once Plaintiff has produced evidence "sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate."  *Id.*, 45 F.3d at 361 (citations omitted).  If the employer presents evidence of its inability to accommodate, the plaintiff "has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence."  *Id.* (quoting *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 308 [5th Cir.1981]).

_____

[7]Defendant does cite to *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999) for the proposition that: "[P]laintiff must reconcile the inconsistencies between her competing statements in the lawsuit and in her claim for government benefits."  (Def.'s Br. at 24.) Nonetheless, the predicate "inconsistencies" in Plaintiff's "claim for government benefits" to which Defendant refers are found nowhere in the record.  Instead, Defendant asks me to *infer* the existence of such inconsistencies based on evidence that: (1) the CLDE notified Plaintiff it was conferring benefits upon her because she was "mentally unable" to perform her work; (2) Plaintiff was the only person who provided information to the CDLE prior to the issuance of this notice; and (3) Plaintiff took no steps to "correct" the CDLE's determination.  (*Id.* at 23–24.) Nonetheless, Defendant's *own* proffered evidence undercuts its theory that Plaintiff made inconsistent statements to the CDLE, as Plaintiff's online application for CDLE benefits demonstrates she clearly answered, "Yes," to the questions: (1) "Were you qualified (training, education, experience) to perform the work?" and (2) "Were you able to perform the work?" (Def.'s Reply, Ex. 35 at 8 [CDLE Application].)  I encourage Defendant to read its proffered evidence in the future, just in case I do.

There is no question that Plaintiff has met her initial burden of demonstrating a genuine issue regarding whether she could make "a facial showing that accommodation is possible." *Id.*, 45 F.3d at 361. Indeed, Plaintiff's proffered evidence showing she was actually afforded her requested accommodation prior to her termination clearly shows that such accommodation is *possible*. (*See* Pl.'s Resp., SAF ¶ 8; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 8).

It is a closer question whether Defendant has met its burden of *production* showing an "inability to accommodate." *White*, 45 F.3d at 361. Indeed, Defendant has both admitted to providing the requested accommodations to Plaintiff in the past, and asserted in its briefing that such accommodations were reasonable. (*See* Def.'s Reply, RSAF ¶ 8; Def.'s Br. at 25.)[8] Nonetheless, Defendant has *arguably* met its burden of production by citing evidence that structural changes in Defendant made the ongoing proofreading of Plaintiff's work untenable in the long-term. (Def.'s Br., Ex 7-1 at 4–5, 22 [Henson Dep.].)

Regardless, Plaintiff has more than demonstrated a genuine issue "concerning [her] individual capabilities and suggestions for possible accommodations" that precludes summary judgement. *White*, 45 F.3d 361. First, Plaintiff's evidence that Defendant provided her the requested accommodations in the past at least demonstrates a genuine issue regarding whether it

---

[8]Defendant also makes the confused, alternative argument that Plaintiff's requested accommodations were *not* reasonable because these accommodations "yielded no discernable improvements in [Plaintiff's] written communication skills." (Def.'s Br. at 27.) Defendant here confuses the question of whether Plaintiff was terminated for a legitimate, non-discriminatory reason (*i.e.*, that she failed to perform the functions of her job, even with reasonable accommodation), with the antecedent — and conceptually distinct — question of whether her requested accommodations, viewed in the abstract, were *reasonable*.

could have *continued to do so in the future*. (*See* Pl.'s Resp., SAF ¶ 8; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 8.) Second, Plaintiff has proffered evidence that Ms. Henson did not know how much time she spent each day proofreading Plaintiff's email during the thirty-day improvement period, and acknowledged that communicating with and dealing with her employees were a "core part" and a "significant part" of her job. (*See* Def.'s Br., Ex 7-2 at 1 [Henson Dep.].) Such evidence demonstrates a genuine issue regarding whether Plaintiff's requested accommodations could have been sustained indefinitely.[9] Based on the foregoing, I find that Plaintiff has demonstrated a genuine issue regarding whether she could perform her job with reasonable accommodation.

### iii.    Termination "Because of" Plaintiff's Disability

To establish the final element of her *prima facie* case, Plaintiff must "present some affirmative evidence that disability was a determining factor in the employer's decision." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001) (citation and quotation marks omitted). Defendant argues Plaintiff cannot establish she was terminated "because of" her

---

[9]I also acknowledge Defendant's argument that it is entitled to summary judgment on this issue because Plaintiff "[i]n effect . . . was asking that the standards of the job be lowered as an accommodation for her dyslexia." (Def.'s Br. at 26 [citing *Frazier v. Charles E. Simmons*, 254 F.3d 1247, 1261 (10th Cir. 2001) for the proposition that "an accommodation that eliminates an essential job function is not a reasonable accommodation"].) Regardless of what Defendant believes Plaintiff was "in effect" requesting, a simple perusal of her argument demonstrates that, *in reality*, she was merely requesting the same accommodations she asserts she had always been afforded, namely, extra time to complete her work, and third-party proofreading of important documents. (*See* Pl.'s Br. at 40–41.) This court finds Defendant's senseless slaughter of strawmen as ineffective as it is ungallant.

dyslexia because she was actually terminated due to unsatisfactory job performance.  (Def.'s Br. at 27–30.)

Circumstantial evidence of discriminatory animus coupled with disparate treatment may satisfy the third prong of the *prima facie* case.  *See Butler,* 172 F.3d at 749 (10th Cir. 1999).  Moreover, the sequence of events leading to discharge may constitute circumstantial evidence of discriminatory animus.  *Id*. (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 [2d. Cir. 1994] with approval).

Plaintiff has demonstrated a genuine issue regarding whether her dyslexia was a determining factor in Defendant's decision to terminate her.  Specifically, she has cited evidence that: (1) she was successful in her "Client Consultant" position for one year before Ms. Henson became her new supervisor; (2) her "Client Consultant" job description remained unchanged after Ms. Henson took over, and (3) she was terminated for problems with her written communications, which Plaintiff claims are symptoms of her dyslexia.  (Pl.'s Resp., SAF ¶¶ 1, 20; *admitted in relevant part at* Def.'s Reply, RSAF ¶¶ 1, 20; *id.*, SAF ¶ 24, *denied at* Def.'s Reply, RSAF ¶ 24.)[10]  Viewed in the light most favorable to Plaintiff, these facts provide circumstantial

---

[10]Remarkably, Defendant refuses to even acknowledge that problems with written communications may be symptoms of dyslexia, arguing that Plaintiff is incompetent to testify to such a medical conclusion.  (*See* Def.'s Reply, RSAF ¶ 24.)  Nonetheless, I find that Plaintiff's proffered expert testimony would likely be sufficient to demonstrate a genuine issue regarding whether problems with written communications could be symptoms of dyslexia, notwithstanding the purported foundational problems with this testimony that I addressed above.  (*See* footnote 4, *supra*; *see also* Pl.'s Resp., Ex. H at 5 [Disability Report] [stating that symptoms of dyslexia include "overly phonetic spelling errors . . . and poor application of the rules of grammar"].)

evidence that discriminatory animus motivated Ms. Henson's decision to terminate Plaintiff. Moreover, Plaintiff has proffered evidence that Ms. Henson made grammatical mistakes in her own writing and was not monitoring the communications of Plaintiff's coworkers to see if they were ungrammatical. (Def.'s Br., Ex. 11 at 3 [Annotated Self-Evaluation] [misspelling "accommodation"]; Pl.'s Resp., Ex. M at 13 [Henson Dep.].) Viewed in the light most favorable to Plaintiff, these facts suggest that Plaintiff was held to a higher standard than other employees at Defendant, including Plaintiff's coworkers. Accordingly, I find that Plaintiff has demonstrated a genuine issue regarding whether dyslexia was a determining factor in her termination, thus enabling her to establish a *prima facie* case. For the purposes of my remaining analysis, I assume that Defendant's stated rationale for terminating Plaintiff — namely, unsatisfactory job performance premised her ungrammatical written communications — constitutes a legitimate and non-discriminatory reason.

### iv. *Defendant's Stated Reasons as Pretext*

To show that an employer's stated reasons for terminating an employee were pretextual, the employee must "demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." *Butler*, 172 F.3d at 750 (citation omitted). In assessing a plaintiff's contentions of pretext, a court must examine the facts "as they appear[ed] to the person making the decision to terminate [the] plaintiff" and may not second-guess that person's business judgment. *Selenke*, 248 F.3d at 1261 (citations omitted). Defendant argues Plaintiff has

proffered insufficient evidence to establish pretext, and that its decision to terminate her was legitimate due to the business judgment rule. (Def.'s Br. at 30–32.)

Upon review, I find that Plaintiff has demonstrated a genuine issue of material fact regarding whether Defendant's stated reasons for terminating her were pretextual. First, the "Final Warning Notification" Ms. Henson issued to Plaintiff on February 23, 2005, referred to "previous annual performance reviews" which purportedly identified problems in Plaintiff's written communications, but the only such reviews Defendant has proffered are Ms. Henson's own February 2005 review, and an interim assessment from *six years earlier* containing a mildly worded rebuke.[11] (Def.'s Br., Ex. 15 at 1 [Final Warning], Ex. 13 [Henson Review], Ex. 9 at 2 [1999 Interim Review].) Second, the notification also referred to "verbal communications" between Plaintiff and "prior management" that purportedly related to similar concerns, but Ms. Henson admitted in a deposition that she had no direct knowledge of such conversations, and had learned about them from Ms. Lennon. (Def.'s Br., Ex. 15 at 1 [Final Warning], Ex. 7-1 at 16 [Henson Dep.].) Ms. Lennon, in turn, testified that she had been "aware" of previous concerns regarding Plaintiff's communications, but did not know "how or why" she had such knowledge. (Pl.'s Resp., Ex. K at 14 [Lennon Dep.].) Viewing these facts in the light most favorable to the Plaintiff, I find a reasonable jury could conclude that Ms. Henson invented or inflated past problems relating to Plaintiff's written communications to justify placing her on the thirty-day improvement plan.

---

[11](*See* footnote 6, *supra*.)

Second, Ms. Henson stated in her deposition that: (1) she "spot checked" Plaintiff's mailbox throughout the final warning period without telling Plaintiff; (2) as of February 25, 2005, was counting the number of errors Plaintiff committed daily in her emails, but could not recall whether she told Plaintiff about this counting; and (3) did not have a goal in mind regarding how many errors she wanted or expected to find in Plaintiff's emails. (Def.'s Br., Ex. 7-1 at 15, 24 [Henson Dep.].) Additionally, Ms. Henson sent an email to Ms. Lennon and another redacted recipient on March 18, 2005, in which she outlined her "last counseling meeting" with Plaintiff, and concluded: "Unless either of you have any objections, I am moving forward with her termination on Tuesday, as planned." (*Id.*, Ex. 27 [3/18/2005 Email].) Viewing these facts in the light most favorable to Plaintiff, I find a reasonable jury could conclude that Ms. Henson began planning Plaintiff's termination as early as February 25, 2005, and decided to "document" the file to support her eventual termination of Plaintiff. Accordingly, I find Plaintiff has demonstrated a genuine issue regarding whether Defendant's proffered reasons for her terminating are "unworthy of belief." *Butler*, 172 F.3d at 750 (citation omitted).

Defendant nonetheless counsels against this conclusion by arguing that Plaintiff's (1) ungrammatical emails, (2) acknowledgment that some of these emails were ungrammatical, (3) failure to follow the strictures of the thirty-day improvement plan, and (4) failure to improve during the final warning justifies Ms. Henson's decision to terminate her under the business judgement rule. (Def.'s Br. at 27–32; Def.'s Reply at 40–44.) I disagree. The business judgement rule protects Ms. Henson's actions to the extent they were taken in good faith, but

Plaintiff has proffered more than sufficient evidence to suggest that Ms. Henson was *not* acting in good faith when she placed Plaintiff on a final warning, or monitored her emails throughout the thirty-day improvement plan. *See Rekstad v. First Bank Sys., Inc.*, 30 F. App'x. 842, 848–49 (10th Cir. 2002) ("The relevant inquiry is not whether [Defendant's] proffered reasons were wise, fair or correct, but whether [Defendant] honestly believed those reasons and acted in good faith upon those beliefs." [citation and quotation marks omitted]). Thus, I find Defendant's proffered evidence insufficient to undermine my holding.

### b. Retaliation

The ADA provides that: "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C.A. § 12203(a) (West 2007). To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007). To prove a causal connection, a plaintiff may proffer "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Id.* (citation and quotation marks omitted).

Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation because she has insufficient evidence to suggest that: (1) she was terminated subsequent to or contemporaneously with the filing of her first EEOC charge; or (2) a causal connection exists between the filing of her charge and her termination. (Def.'s Br. at 32–33.) Defendant does not contest that Plaintiff's filing of her first EEOC charge constituted a protected activity in opposition to discrimination, nor that her termination was a "materially adverse" action. (*See id.*)

As an initial matter, I note that *both* of Defendant's arguments pertain to the third prong of Plaintiff's *prima facie* case, namely, whether she can establish a "causal connection" between the filing of her first charge and her termination. Although *earlier* Tenth Circuit cases styled "temporal proximity" and "causal connection" as distinct elements of the *prima facie* case, *subsequent* Tenth Circuit cases have clarified that proof the former merely serves a specialized and non-exclusive means of establishing the latter. *Compare Selenke*, 248 F.3d at 1264 (styling the two elements as distinct), *with Piercy v. Maketa*, 480 F.3d 1192, 1198–99 (10th Cir. 2007) (noting "[t]he passage of time does not necessarily bar a plaintiff's retaliation claim if *additional* evidence establishes the retaliatory motive" [emphasis in original]).

Upon review, I find that Plaintiff has proffered sufficient evidence to demonstrate a genuine issue of material fact regarding whether the circumstances of her termination "justify an inference of retaliatory motive." *Proctor*, 502 F.3d at 1208. First, despite the parties' cramped styling of the causation issue as relating solely to the question of whether Plaintiff's termination was related to *her first EEOC charge*, I note that Plaintiff's apparent request for accommodation

from Ms. Henson sometime February 2005 could *itself* have constituted a "protected" activity in opposition to discrimination. *See* 42. U.S.C.A. 12112(b)(5) (West 2007) (defining "discrimination" to include "not making reasonable accommodations"); *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007) ("We have treated requests for reasonable accommodation as protected activity under the ADA." [citations omitted]). Ms. Henson testified that, *prior to* February 23, 2005, Plaintiff had *only* discussed her request for reasonable accommodation with her "*in [their] performance review* and *the subsequent conversations*" relating thereto. (Def.'s Br. Ex. 7-1 at 18 [Henson Dep.].) Plaintiff avers that, in her *first* meeting with Ms. Henson in February 2005, Ms. Henson asked her what reasonable accommodations she needed. (Pl.'s Resp., Ex. I at 3 [Pl.'s Resp. to Interrogs.].) Viewing these facts in the light most favorable to Plaintiff, I find a reasonable jury could conclude that Plaintiff was terminated approximately four to seven weeks after she had *first* requested accommodations from Ms. Henson. Such a brief time period is sufficient to raise an inference of retaliatory motive. *See, e.g., Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171–72 (10th Cir. 2006) (holding four- to six-week period sufficient to justify an inference of retaliatory motive); *Ramirez v. Okla. Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994) (observing that one and one-half month period could be sufficient to justify an inference of retaliatory motive), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186 (10th Cir.1998). Moreover, even if the approximate four- to seven-week lapse between Plaintiff's first request for accommodation from Ms. Henson and her termination could not support an inference of retaliatory motive, the

-34-

approximate zero- to three-week lapse between this request and the beginning of her thirty-day improvement plan certainly could. *See, e.g.*, *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091–92 (10th Cir. 2007) (holding three-week period sufficient to allow jury to infer causation); *see also Burlington N. & Santa Fe Ry. v. White*, — U.S. —, 126 S. Ct. 2405, 2415 (2006) (defining "materially adverse" action as that which "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination" [citation and internal quotation omitted]); *Browne v. Potomac Elec. Power Co.*, No. 05-1177(RWR), 2006 WL 1825796, *3 (D.D.C. July 3, 2006) (finding poor performance evaluation and formal disciplinary action to be materially adverse actions). Accordingly, I find that Plaintiff has proffered sufficient evidence to demonstrate a genuine issue regarding whether the circumstances of her termination "justify an inference of retaliatory motive." *Proctor*, 502 F.3d at 1208.

Moreover, even assuming Plaintiff's sole protected activity was the filing of her first EEOC charge, I find Plaintiff has *still* proffered sufficient evidence to suggest *this* activity was sufficiently temporally proximate to an adverse employment action to justify an inference of retaliatory motive. Specifically, it is undisputed that Plaintiff sent Ms. Henson her completed self-evaluation form sometime in early February and that Ms. Henson testified to having made handwritten marks on this form indicating spelling errors. (Def.'s Br., SOF ¶ 19; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 19; *id.*, Ex. 7-1 at 13 [Henson Dep.].) Ms. Henson has further testified that, sometime prior to a meeting with Plaintiff to discuss her performance review, she had a meeting with someone whom she could not remember "regarding [Plaintiff's]

poor communication skills." (*Id.*, Ex. 7-1 at 14 [Henson Dep.].)  Finally, on February 8, 2005,

Ms. Henson received an email from Ms. Lennon, in which Ms. Lennon urged her to "closely

manage" Plaintiff  because, as Ms. Lennon wrote: "I would be concerned with taking any other

approach *based on her history*."  (*Id.*, Ex. 14 at 1 [2/8/2005 Email] [emphasis added].)  Putting

these facts together, and viewing them in the light most favorable to Plaintiff, I find that a

reasonable jury could conclude that Ms. Henson first learned of Plaintiff's first EEOC charge in

February 2005, when, after receiving what she perceived to be an ungrammatical self-evaluation

form, she discussed Plaintiff's performance with someone who knew about the charge.

Furthermore, and alternatively, I note that Ms. Henson testified she learned of Plaintiff's

dyslexia from Ms. Harding (*id.*, Ex. 7-1 at 7 [Henson Dep.]), who had previously supervised Ms.

Siegal (Pl.'s Resp., SAF ¶ 24 [j]; *admitted at* Def.'s Reply, RSAF ¶ 24 [j]), against whom Plaintiff

had directed her first EEOC charge (Def.'s Br., SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 5.)

Defendant also claims that: "[Ms.] Henson first learned of [Plaintiff's] claimed dyslexia in

February 2005."  (*Id.*, SOF at ¶ 22.)  Viewing *these* facts in the light most favorable to Plaintiff, I

find that a reasonable jury could infer that Ms. Harding *told* Ms. Henson about Plaintiff's first

EEOC charge when she told her about Plaintiff's dyslexia in February 2005.  Thus, through at

least two inferential chains, I find that a reasonable jury could conclude that Ms. Henson first

learned of Plaintiff's first EEOC charge in February 2005.  Such a conclusion, in turn, would

allow Plaintiff to demonstrate sufficient temporal proximity between her protected activity and a

materially adverse employment action to permit an inference of retaliatory motive.

Defendant nonetheless counsels against the above conclusion on three main grounds. I address each in turn. First, Defendant suggests that, because Plaintiff filed her first EEOC charge in early 2004, "her discharge was not temporally proximate to her filing" of the charge. (Def.'s Br. at 32; Def.'s Reply at 45.) I disagree. It is axiomatic under the ADA that an employer must *know* of an employee's protected activity to retaliate thereagainst. *See, e.g., Jones*, 502 F.3d at 1195 ("Unless an employer knows that an employee is engaging in protected activity, it cannot retaliate against that employee because of the protected conduct."). Temporal proximity in the instant case must be adjudged from date Defendant — acting through its agent, Ms. Henson — first learned of Plaintiff's first EEOC charge. *See Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (holding that, "to establish a 'causal connection,' plaintiff must show that the individual *who took adverse action against him* knew of the employee's protected activity" [citation omitted] [emphasis added]).

Defendant next argues that it did not *know* of Plaintiff's first EEOC charge because *Ms. Henson did not know of it.* (Def.'s Br. at 32–33.) Specifically, Defendant points to Ms. Henson's and Ms. Lennon's deposition testimony stating that they did not know of the charge, and asserts that "Plaintiff has no admissible evidence to the contrary." (Def.'s Br. at 32; Def.'s Reply at 44.) Defendant's inadmissibility argument, however, resolves into the assertion that: "Plaintiff's speculation that [Ms.] Lennon" was referencing anything other than "[Plaintiff's] history . . . [of] past problems with her written communications" in her February 8, 2005, email to Ms. Henson "is inadmissible." (Def.'s Reply, RSAF ¶ 25[a]). This is untrue. Plaintiff does not proffer her own

speculations as to what the evidence means *as evidence itself*; instead, she proffers Ms. Lennon's *own words* as evidence from which a jury could *infer* that Ms. Henson knew of Plaintiff's first EEOC charge by the time of their email exchange. Moreover, a reasonable jury could still *separately* infer that Ms. Henson learned of Plaintiff's first EEOC charge from Ms. Harding, as demonstrated above.

Finally, Defendant argues that, even assuming Ms. Henson was aware of Plaintiff's first EEOC charge, "there is no evidence that [Plaintiff's] prior charge played any role, whatsoever, in Henson's decision to terminate [Plaintiff's] employment." (Def.'s Br. at 32.) Although the precise import of this argument is hard to divine, Defendant appears to be arguing that — irrespective of whether Plaintiff can establish temporal proximity — she must *additionally* proffer *direct evidence* of "a causal connection" to survive summary judgement.[12] This is untrue. *See, e.g.*, *Piercy*, 480 F.3d at 1198–99 (specifying that proof of temporal proximity serves as a *specialized means* of establishing causal connection). Moreover, Defendant's assertion that "[Ms.] Henson's actions in counseling [Plaintiff], proofreading her emails, and meeting with her each week to discuss [her] progress and on-going problems solidly establish that [Ms.] Henson's focus was entirely on trying to improve [Plaintiff's] written communication deficiencies" is unconvincing. (Def.'s Br. at 33.) I find that a reasonable jury could easily conclude that, having decided to retaliate against Plaintiff for her first EEOC charge, Ms. Henson also decided to

---

[12]Such a belief — assuming it *is* Defendant's belief — is likely premised upon Defendant's apparent misperception that the *prima facie case* requires *both* temporal proximity *and* causal connection. (*See* Def.'s Br. at 32.)

extensively document every step of her interactions with Plaintiff during the thirty-day

improvement plan, perhaps to provide cover in this precise lawsuit.

Accordingly, I find that Plaintiff's has proffered sufficient evidence to demonstrate a

genuine issue regarding whether the circumstance of her termination could "justify an inference of

retaliatory motive." *Proctor*, 502 F.3d at 1208.

**2.      *Conclusion***

Based on the foregoing it is therefore ORDERED that:

1. DEFENDANT's motion (#39) is DENIED.

The court will hold a Final Pretrial Conference commencing at **9:30 o'clock a.m.** on

**January 22, 2008**, in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901

19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties

and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial

Order, a copy of which can be downloaded from the court's web site, specifically

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord_ins.pdf and (2) utilize

the specific template located at

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord.wpd  These specific

web addresses should be used to insure that the proper format is observed.

Dated this 20th day of December, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge